IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAMES R. TIEMAN,                    :
                                    :
            Plaintiff               :
                                    :
        v.                          :    Civ. No. 12-856-LPS
                                    :
MICHAEL J. ASTRUE,                  :
Commissioner of                     :                    UNSEALED ON
Social Security,                    :                    MAY 15, 2014
                                    :
            Defendant               :

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff James R. Tieman ("Tieman" or "Plaintiff") appeals from a decision of Defendant

Michael J. Astrue, the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying his application for disability insurance benefits ("DIB") under Title II of the Social

Security Act, 42 U.S.C. §§ 40133. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by

Tieman and the Commissioner. (D.I. 17, 19) Tieman asks the Court to reverse and remand

Defendant's decision. (D.I. 17) Defendant requests that the Court affirm his decision denying

Plaintiff's application for benefits. (D.I. 19) For the reasons set forth below, the Court will deny

Plaintiff's motion and grant Defendant's motion.

## II.   BACKGROUND

### A.    Procedural History

Tieman filed his application for supplemental social security income and DIB in May

1

2008. Tieman alleged disability beginning March 20, 2008.[1] The application was denied in

December 2008, and was again denied on reconsideration on March 26, 2009. Tieman filed a

request for rehearing on May 4, 2009. On August 17, 2010, a hearing was held before an ALJ,

who issued a decision affirming his denial on October 6, 2010. Tieman filed a request for review

by the Appeals Council on October 11, 2010, which was denied on May 3, 2012. (D.I. 13 ("Tr.")

6, 12)

On July 9, 2012, Tieman filed a Complaint seeking judicial review of the ALJ's October

6, 2010 decision. (D.I. 2) Tieman moved for summary judgment on March 21, 2013. (D.I. 17)

The Commissioner filed a cross-motion for summary judgment on April 22, 2013. (D.I. 19)

**B.    Factual Background**

**1.    Plaintiff's Medical History, Treatment, and Conditions**

Tieman was forty-seven (47) years old when he applied for DIB and supplemental social

security income on May 27, 2008. (Tr. 122-25) He attended high school through the tenth grade,

and does not have a GED. (Tr. at 44) Tieman is twice divorced (Tr. 123, 198) and has no

children (Tr. 43). He worked in construction as a painter from the time he left high school until

his accident in 2004. (Tr. 45-46) After that time, Tieman briefly held a job as maintenance

worker or groundskeeper, from February to May of 2005, but has not been employed since. (Tr.

45, 70) Tieman alleges he became disabled beginning March 20, 2008. (Tr. 121) He asserts his

disability arises from lower back pain and pain and numbness in his right leg, which have

---

[1]Tieman originally alleged that he became disabled on March 15, 2004. (Tr. 122) He amended the date of onset of his disability to March 20, 2008 (Tr. 121) after an unfavorable prior decision by an Administrative Law Judge ("ALJ"), issued March 19, 2008, found him not disabled (Tr. 68-76).

persisted since his involvement in a motor vehicle accident in 2004. (Tr. 150)

Tieman was treated for his pain and other medical conditions by the following physicians:
Dr. Patel, a primary care physician (Tr. 266-301, 331-36); and Drs. Godfrey, D.O. (Tr. 231-63,
337-44), Dickinson, M.D. (Tr. 376-99), and Arian, M.D. (Tr. 374-75), all of whom are pain
management specialists. Consultative providers who participated in Tieman's care include Dr.
Freid, M.D., a rehabilitation specialist (Tr. 372-73); Dr. Shah, a gastroenterologist (Tr. 319-30);
and individuals at Barker Physical Therapy (Tr. 354-70, 392).

Other professionals' interactions with Tieman or reviews of his medical history are also
part of the record before the Court. These non-treating practitioners include: Dr. Chavarry, M.D.
(Tr. 197-204), an internist who performed a consultative medical examination of Tieman as part
of his examination for the Social Security Administration; Dr. Keyes, Ph.D. (Tr. 191-96), a state
agency psychologist who performed a psychological evaluation of Tieman as part of his
examination for the Social Security Administration; Dr. Borek, D.O. (Tr. 205-16), a physician
who completed a physical RFC assessment; and Dr. Fugate, Ph.D. (Tr. 217-30), a psychologist
who completed a mental RFC assessment.

### a. Disc damage/Joint disease/Back pain

According to Tieman, he was involved in an automobile collision in March 2004, after
which he has experienced lower back pain and muscle spasms as well as pain and numbness in
his right leg. (Tr. 45-48) Tieman attributes the pain to degenerative disease affecting his L4-L5
(lumbar) vertebrae, sacroiliac ("SI") joint dysfunction, and sciatic nerve involvement. (Tr. 45-
46)

Tieman states that he requires a cane to walk or stand, and that Dr. Godfrey prescribed the

use of a cane sometime in 2006. (Tr. 47) The record before the Court contains no evidence of an order for a cane or an indication that it was medically necessary; the records of Dr. Godfrey for that period in time are not available. (Tr. 232) Dr. Godfrey's notes report Tieman was using a cane at least at times in 2007 and 2009. (Tr. 238, 21, 338-41) The records of Dr. Sharad Patel, M.D., Tieman's primary care physician, consistently note Tieman's abnormal station and gait, but do not note the use of a cane. (Tr. 267-300, 332-36)[2]

Tieman asserts that the pain and numbness have prevented him from engaging in any form of gainful work since May 2005. (Tr. 45) Several physicians specializing in pain management have treated Tieman since 2004, beginning with Eugene Godfrey, M.D. Records from Dr. Godfrey's treatment of Tieman prior to June of 2008 are limited due to the loss of most of Dr. Godfrey's patient records in an office fire on June 1, 2008. (Tr. 232) In November 2004, based on impressions of degenerative disc disease and SI joint inflammation, Dr. Godfrey treated Tieman with epidural steroid injections, as well as lumbar facet and SI joint injections. (Tr. 263) Lumbar epidural steroids were administered again on March 31, 2005 (Tr. 261), and facet injections again on April 29, 2005 (Tr. 259). In May 2005, Tieman declared the injections ineffective and declined further treatments by injection or manipulation; Dr. Godfrey opined that Tieman's condition was unresponsive to conservative treatment and might be "a long term situation." (Tr. 257) Subsequent observations by Dr. Godfrey indicated that Tieman's pain complaints remained unchanged. Dr. Godfrey saw Tieman monthly to monitor his narcotic medication use.

---

[2]The ALJ found that at least one physician recommended that Tieman try to get rid of his cane, although Tieman indicated that he did not think he could do that. (Tr. at 23)

4

Dr. Godfrey continued to see Tieman approximately every month between September of 2005 and February of 2009. (Tr. 233-56) Multiple dictated notes from this period indicate that: (1) Dr. Godfrey could find no objective pathological basis for Tieman's pain; (2) Tieman's lumbar spine pain complaints remained unchanged; (3) Tieman received regular prescriptions for narcotic analgesics; and (4) in Godfrey's opinion, Tieman's prognosis for improvement was nil. (Tr. 233-56)

In November and December of 2006, Tieman underwent a month of manipulative treatment with spinal disc decompression therapy (IDD); subsequent notes do not address the result of this treatment. (Tr. 245-46) In December of 2006, Dr. Godfrey provided a certification for Tieman's application to the State of Delaware for a special disabled person's parking permit, indicating by checkbox that the reason for the permit was Tieman's "severe[] limit[ation] in his . . . ability to walk due to an arthritic, neurological or orthopedic condition." (Tr. 343-44) A single note from this period, dated November 12, 2007, indicates that Tieman was observed walking with a cane. (Tr. 241) Encounter records from April , September, and October, 2009 indicate that Tieman was using a cane and regularly receiving prescriptions for Percocet (oxycodone with acetaminophen) for pain, Soma (carisoprodol) for muscle spasms, and trazodone for sleep. (Tr. 338-41)

On July 24, 2009, Tieman was seen in the emergency department of the Bayhealth Medical Center by Dr. Kelly Abbrescia, M.D., for an acute exacerbation of his back pain. (Tr. 304-14) A spine X-ray showed no acute changes. (Tr. 313) He was given intravenous opiate analgesics and steroids and sent home. (*Id.*)

Tieman began seeing Eva Dickinson, M.D. and Howard Arian, M.D., both of

5

Compassionate Pain Management, in December of 2009. Dickinson's diagnostic impressions of Tieman included degenerative disc disease of the lumbar spine with facet arthropathy and lumbar radiculopathy.[3] (Tr. 398-99) Dickinson ordered an MRI scan of Tieman's lumbar spine, which was performed on December 21, 2009, and showed "a subtle disc bulge without significant narrowing of the spinal canal or neural foramen" at the L4-L5 vertebral level. (Tr. 302) The study showed no other abnormalities in the region of the L2 through S1 vertebrae, and the radiologist's impression was of "[m]ild degenerative disease . . . [without] disc herniation or spinal canal narrowing." (Id.) Over the next six months, Dickinson and Arian saw Tieman monthly for prescription renewals. Examination on these visits consistently revealed pain and tenderness over the right SI joint, Tieman was routinely observed to be using a cane, and he continued to report low back pain radiating to the right leg. (Tr. 376-98) On June 10, 2010, Arian performed another steroid injection of Tieman's right SI joint. (Tr. 374-75)

Arian subsequently referred Tieman to Barker Physical Therapy. Tieman had his first session with Barker on July 8, 2010. (Tr. 364) Physical therapist Pender's objective assessments at that time included lumbar and SI joint tenderness, and a pain score of 8 (out of a possible 10); Pender noted that Tieman walked with a cane. The record documents thirteen visits to Barker by Tieman as of August 9, 2010.

Dickinson completed a Physical Residual Functional Capacity questionnaire for Tieman on August 14, 2010. (Tr. 393-96) The questionnaire responses reiterate a diagnosis of lumbar

---

[3]Facet arthropathy refers to disease of the joints between the vertebral processes of the spinal vertebrae, as distinct from the intervertebral discs. Radiculopathy refers to neurological symptoms, such pain radiating away from the spine, weakness, and numbness, associated with compression or irritation of the spinal nerve roots near the vertebrae.

6

degenerative disc disease and bilateral SI joint dysfunction, with resulting symptoms of low back and hip pain, muscle spasms, and insomnia, as well as symptoms of anxiety and depression. (Tr. 393) Dickinson indicated that epidural and SI injection treatments, as well as physical therapy, had not improved Tieman's pain, and further stated that Tieman "has chronic pain that is unrelenting and he is completely focused on it." (Tr. 393-94) Dickinson estimated that Tieman's pain was sufficiently severe to interfere "frequently" with his attention or concentration, that he could neither sit for more than 15 minutes nor stand for more than 5 minutes without changing position, that he required a cane to stand or walk, and that he could not lift or carry more than 10 pounds. (Tr. 394-95) She further estimated that Tieman would require unscheduled breaks every one to two hours during an eight hour workday, and that his pain would likely cause Tieman to be absent from work more than four times per month. (Tr. 395-96)

Tieman was further evaluated on August 5, 2010 by Dr. Jay Freid, M.D., a neurology and rehabilitation specialist, to whom Tieman was referred by his primary care physician, Dr. Patel. (Tr. 372) Dr. Freid's findings on physical examination included tenderness over the right lumbar paraspinal muscles, and diffuse hypersensitivity with paresthesia in the right, but not left, leg, consistent with the other physicians' findings. (Tr. 372) Freid found no pain with knee or hip movement and that Tieman still had full strength in his legs. (*Id.*) Freid opined that Tieman's past diagnostic imaging (MRI) and nerve conduction (EMG) studies revealed no clear cause for Tieman's radiculopathy symptoms. (Tr. 373) He noted Tieman's use of a cane and that Dr. Arian had suggested to Tieman that he should try to do without it. (Tr. 372) Finally, Freid made several suggestions encouraging Tieman to return to a normal schedule, become more involved in outside activities, and become more physically active to counter the physical deconditioning

7

and poor function he was experiencing at home. (*Id.*)

Dr. Patricia Chavarry, D.O., provided a medical evaluation of Tieman at the request of the Delaware Disability Determination Service on November 20, 2008. (Tr. 197) Chavarry's report indicates conflicting findings regarding Tieman's range of motion and functional limitations, with Tieman unable to flex at all during formal testing of his hips, yet apparently able to flex sufficiently to retrieve and tie his shoes without assistance at the end of the exam. (Tr. 199-200) She observed that Tieman used a cane, and had decreased strength and sensation on the right side, but that his reflexes were normal and no other neurologic abnormalities were present. (*Id.*) Chavarry cited a lack of recent imaging studies with which to correlate her clinical findings. (Tr. 200)

## b. Depression and anxiety

Records of Tieman's visits to Dr. Sharad Patel, M.D., of Dover Family Physicians, identify anxiety as an issue for Tieman. The earliest visit noted in the record occurred on February 13, 2008 and listed Valium (diazepam) 10 mg, taken three times daily, as part of Tieman's medication regimen. (Tr. 300) A subsequent note on May 16, 2008 identifies anxiety and depression as problems and states that the anxiety has "been occurring in a persistent pattern for years." (Tr. 297) This assessment, and a renewal of the Valium prescription, appears in the record of each subsequent quarterly visit to Patel by Tieman through March of 2010 (Tr. 297-300, 332-36), when the symptoms are described as moderately severe "anxiety, insomnia and nervousness . . . occur[ring] constantly." (Tr. 332) The antidepressant Prozac (fluoxetine), 20 mg daily, was added to Tieman's medication regimen on June 29, 2009 and continued through the March 10, 2010 visit. (Tr. 332)

8

There is no record evidence of Dr. Patel ever having referred Tieman for evaluation of or treatment for anxiety or depression by a psychiatrist or psychologist. In his consultative evaluation of Tieman, discussed above, Dr. Jay Freid also noted that depression might be playing a role in Tieman's apparent anxiety, and recommended the addition of an antidepressant medication, Celexa (citalopram), without noting whether Tieman was still taking Prozac. (Tr. 372)

Dr. Godfrey submitted a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" evaluation form, dated November 12, 2008. (Tr. 188-90) Dr. Godfrey rated Tieman only "Fair" with respect to "Making Occupational Adjustments" in two categories: dealing with work stresses, and maintaining attention/concentration. (Tr. 188) He rated Tieman "Fair" with respect to "Making Performance Adjustments" in the category of understanding, remembering, and carrying out complex job instructions. (Tr. 189) Godfrey attributed these limitations to Tieman's drug treatment with Percocet, Soma, and the sleep aid Ambien CR, and indicated by check-box that he did not believe Tieman had "the capacity to endure the mental demands of competitive work on a sustained basis (i.e. 8 hours per day, 5 days per week)." (Tr. 188-90)

Dr. Joseph Keyes, Ph.D. performed a psychological evaluation of Tieman for the Delaware Disability Determination Service on November 18, 2008. (Tr. 191) Keyes noted that Tieman had been prescribed Xanax (alprazolam) for anxiety and panic attacks by his primary care physician "for the last couple of years;" this assertion cannot be reconciled with the records of Tieman's visits to Dr. Patel, discussed above. (Tr. 192) Keyes noted Tieman's sadness and disappointment with his condition, and loss of interest in activities, as well as his episodes of anxiety, which occurred particularly in public or social situations. (Tr. 193) He found that

9

Tieman had mild symptoms of depression and experienced panic attacks. (*Id.*)

Dr. Fugate completed the mental FRC assessment of Tieman. The assessment was significant for Category 12.04 Affective Disorders (for dysthymic disorder), and Category 12.06 Anxiety-Related Disorders (for panic disorder with agoraphobia). (Tr. 217-21) With respect to the paragraph "B" listings of functional limitations, Fugate found Tieman's impairments to be as follows: Activities of Daily Living: mild; Maintaining Social Functioning: moderate; Maintaining Concentration, Persistence, or Pace: moderate; and Episodes of Decompensation: none. (Tr. 225) Fugate found that the evidence did not establish the presence of any paragraph "C" criteria. (Tr. 226) Finally, in his summary conclusions, Fugate found Tieman "markedly limited" only with respect to two categories: the ability to understand and remember detailed instructions, and the ability to carry out detailed instructions. (Tr. 228) Fugate found Tieman "able to meet the basic mental demands of simple work in a low impact setting." (Tr. 230)

### c. Other

Sharad Patel, M.D., was Tieman's primary care physician. The record contains documentation of Tieman's regular visits to Patel during the period spanning February 2008 to March 2010. (Tr. 267-300, 332-36) Patel treated Tieman with medication for hypertension and high cholesterol, as well as Valium for his symptoms of anxiety and, beginning in June 2009, Prozac (fluoxetine) for symptoms of depression. (*Id.*) Early in 2008, Patel referred Tieman to Ashish Shah, M.D., a gastroenterologist, for evaluation after finding abnormal results in laboratory studies of Tieman's liver function. (Tr. 320-22) In Shah's opinion, the abnormalities may have been related to alcohol consumption; Tieman was instructed to moderate his alcohol intake, and his laboratory values subsequently normalized without further intervention. (*Id.*)

10

### d. Overall

Dr. Borek provided a Residual Functional Capacity ("RFC") assessment summarizing all of the available medical and examining source opinions. (Tr. 205-16) The RFC document shows that the various sources agree that Tieman has degenerative disease of the lumbosacral spine, which could cause his symptoms of pain and dysfunction. (Tr. 216) However, there were inconsistencies between Tieman's observed function and the results of his formal range of motion ("ROM") testing, that the finding of decreased sensation on the entire right side of his body was implausible and inconsistent with other findings, and that, as a result, his allegation of inability to perform even sedentary activity without a cane was only partially credible. (*Id.*)

### 2. The Administrative Hearing

Tieman's administrative hearing took place in Dover, Delaware on August 17, 2010, before an ALJ, in the presence of counsel for Plaintiff, vocational expert ("VE") Schmidt, and a hearing monitor. (Tr. 41)

### a. Plaintiff's testimony

Tieman testified that he was 49 years old, 5 feet 6 inches tall, and weighed about 157 pounds. (Tr. 42) He completed the tenth grade in high school, and did not subsequently earn a GED. (Tr. 44) He possesses a driver's license, drives himself to physician visits and to shop for groceries, and has a disability tag for his car because of the pain and numbness in his legs. (Tr. 43) Prior to 2004, he was employed in construction as a painter. (Tr. 44) Subsequent to his injury, he worked from February to May of 2005 picking up trash at Hyde Point Park in Frederica, but lost that job when his employer found him unable to perform more strenuous labor like digging and lifting heavy equipment. (Tr. 45) He has not worked for pay since then, and

11

receives assistance in the form of welfare, food stamps, and Medicaid. (Tr. 45, 55)

Tieman further testified that he became disabled in March of 2004 when he was injured in a car accident. (Tr. 46) He stated that his medical problems include sciatica, sacroiliac disease, and degenerative disc disease at L4 and L5, and that he suffers from constant pain and frequent muscle spasms in his back and leg, which are only partially relieved by the oxycodone and Soma prescribed by his doctor. (Tr. 47-49) He uses a cane to walk, which he stated was prescribed by Dr. Godfrey some time in 2006, and requires the cane even when standing still. (*Id.*) Dr. Godfrey recommended to Tieman that he not lift anything weighing more than five pounds. (Tr. 53) He has difficulty bending to pick things up from the floor, and cannot sit in one position comfortably for more than ten to twenty minutes at a time. (Tr. 52-53) His grocery shopping and food preparation abilities are limited to pre-prepared meals. (Tr. 55) His sister helps him with housekeeping and his brother-in-law takes care of his yard. (Tr. 53-54)

Tieman testified that he has difficulty sleeping. (Tr. 53) He uses a recliner chair to sleep in, and cannot stay asleep through the night, despite treatment with both Ambien and diazepam. (Tr. 55-56) He stated that he was depressed, which meant to him "[n]ot being able to do what I used to do" and "[n]ot being a whole man," but he could recall visiting a psychiatrist only "probably two years ago." (Tr. 56) He related limited social interactions: he does not go out to visit family or friends, and does not engage in recreational activity of any kind. (Tr. 54)

### b. Vocational Expert's testimony

An independent VE also testified at the hearing. (Tr. 57-63) The VE testified that an individual with Tieman's characteristics would be able to perform some unskilled, light-duty occupations, such as office helper, garment sorter, or folder, and that significant numbers of such

12

jobs were present in the regional economy. (Tr. 60-61) When asked to consider the effect of alternating between sitting and standing every 15 to 20 minutes, and a requirement to use a cane even when standing still, the VE opined that these requirements would preclude the ability to sustain full-time employment. (Tr. 62-63)

### 3. The ALJ's Findings

The ALJ concluded that the Plaintiff's medical conditions were not disabling. In reaching this conclusion, the ALJ first considered the nature and severity of Tieman's physical and mental impairments. (Tr. 19-24) The ALJ determined that Tieman's degenerative disc disease was a severe impairment, but that his mental impairment was mild. (Tr. 19, 24)

With respect to degenerative disc disease, the ALJ found that although the Plaintiff's impairment was subjectively severe, there was insufficient objective evidence to meet the requirements of a listing in 20 CFR Part 404, Subpart P, Appendix 1. In particular, the ALJ noted: 1) no evidence in the record of a statement of medical necessity for a cane (Tr. 22); 2) inconsistency between Plaintiff's reports of his strength and sensation and the findings on examination and testing by the consulting internist (Tr. 19-20); 3) a lack of objective findings from MRI and electromyography which would corroborate Plaintiff's sensory complaints (Tr. 21, 25); and 4) a lack of objective justifications for the limitations proposed by Dr. Dickerson in her responses to the physical RFC questionnaire (Tr. 23).

In considering the Medical Assessment of Ability to Do Work Related Activities (Mental) provided by Dr. Godfrey, the ALJ noted Tieman's diagnosis of degenerative disk disease of the lumbar spine with chronic back pain, and Tieman's use of narcotic pain medication, which could impair his reaction time and judgment. (Tr. 22) The ALJ further noted

13

Godfrey's opinion that Tieman would have a "fair" ability to deal with work stress, maintain concentration, and carry out complex job instructions, and a "good" ability to make social adjustments and carry out simple instructions. (*Id.*) The ALJ observed that Godfrey's summary statement, that Tieman "does not have the capacity to endure the mental demands of competitive work on a sustained basis," was inconsistent with the abilities just noted, and further that Godfrey did not offer evidence to substantiate the claim that Tieman could not work for a full day. (*Id.*)

With respect to Plaintiff's anxiety and depression, the ALJ noted that Plaintiff had not sought consultation or treatment specifically for his mental health in at least two years. (Tr. 24) While observing that Plaintiff received anti-anxiety medication prescribed by his primary care doctor, the ALJ observed that the physician's opinion that "the claimant does not have the capacity to endure the mental demands of competitive work on a sustained basis" was inconsistent with the physician's other form responses, which indicated Plaintiff was capable of performing simple repetitive work. (Tr. 23) The ALJ further considered the four broad functional categories for evaluating mental disorders, known as the "paragraph B" criteria. (Tr. 24) In the categories of "Activities of Daily Living," "Social Functioning," and "Concentration, Persistence, or Pace," Plaintiff had mild impairment. (*Id.*) In the final category, "Episodes of Decompensation," there had been no such episodes. (*Id.*) As Plaintiff's impairment was no more than mild in any category, the ALJ concluded that Plaintiff's mental impairments were nonsevere. (*Id.*)

The ALJ concluded that Plaintiff had

14

the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except lift 10 pounds frequently and 20 on occasion, stand for 15 or 20 minutes, sit for 15 to 20, 30 minutes, consistently on an alternate basis eight hours a day and five days a week, avoiding temperature and humidity extremes, and stair climbing, and needs simple, routine unskilled work, requiring low memory and concentration, due to pain and discomfort, svp2 in nature, mildly limited in ability to perform activities of daily living, interact socially, and maintain concentration, persistence, and pace.

(Tr. 25) This residual functional capacity was sufficient, the ALJ found, for Tieman to perform his previous work as a cleaner, or, based on the opinion of the vocational expert, to work as an office helper, garment sorter, or folder. (Tr. 28) As a result, the ALJ found that Plaintiff had "not been under a disability . . . from March 15, 2004, through [October 6, 2010]." (Tr. 29)

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support

15

the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita,* 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586–87; *see also Podohnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex Corp. v. Catrett,* 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

16

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F.Supp.2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that:

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

17

Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen,* 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour,* 806 F.2d at 1190-91 .

## IV.  DISCUSSION

### A.  Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).  Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program.  42 U.S.C. § 1382(a).  A "disability" is defined for purposes of both DIB and SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003) .

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel,* 186 F.3d

18

422, 427–28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter,* 247

F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

**B.      Plaintiff's Argument on Appeal**

Tieman presents four arguments in his appeal. He argues that the ALJ erred: (1) in his assessment of Tieman's residual functional capacity; (2) in rejecting the opinions of Tieman's treating physicians; (3) by failing to offer the vocational expert a hypothetical question that accounted for all of Tieman's functional limitations; and (4) in finding that Tieman did not have a severe mental impairment. The Court considers each of these arguments in turn.

**1.      Whether the ALJ erred in assessing Plaintiff's RFC**

Plaintiff argues that the ALJ failed, in making the RFC determination, to account for Tieman's need for a cane, and Tieman's inability to meet the Agency's requirements for light

20

work of standing and walking for six hours out of an eight hour day. (D.I. 18 at 6-7)  In response, the Commissioner argues that Plaintiff has failed to demonstrate a medical necessity for a cane through objective evidence, and further that the ALJ properly accommodated Plaintiff's limitations with a sit-stand option. (D.I. 20 at 10-12)

The Court concludes that there is substantial evidence to support the ALJ's assessment of Plaintiff's RFC. The record demonstrates that the ALJ accommodated Tieman's need to alternately sit and stand in the RFC determination (Tr. 25) and, with the assistance of the VE, found that even with this additional accommodation Tieman remained qualified to perform several types of jobs present in the economy (Tr. 25, 28). The SSA has recognized that "[i]n situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of work . . . VS [vocational specialist] assistance is advisable." SSR 83–12, 1983 WL 31253, at *3; *see also Santiago v. Barnhart*, 367 F.Supp.2d 728, 733 (E.D. Pa. 2005) ("There is nothing oxymoronic in finding that a plaintiff can perform a limited range of light work."). Thus, the ALJ had a sufficient basis to find that Plaintiff could perform a limited range of light work in that he was limited by the need to be able to sit for fifteen to thirty minutes and then stand for fifteen minutes. (Tr. at 25)

That Plaintiff could not fully perform light work – which requires the ability to stand and walk for one-third to two-thirds of the work day – does not mean that the ALJ was required to determine that Plaintiff had a sedentary RFC. Instead, there is substantial evidence to support the ALJ's classification of Plaintiff as being limited to light work with the additional sitting/standing restriction, including Plaintiff's own testimony and the findings of the consulting physicians.

21

Contrary to Plaintiff's assertion, the ALJ weighed the evidence about Tieman's need for a cane: he addressed the lack of objective evidence from treating physicians showing that Tieman medically *required* a cane, distinguishing such evidence from the multiple observations in the record that Tieman *used* a cane, and noting that at least one treating physician opined that Tieman should attempt to do without the cane. (Tr. 22-23) The ALJ thoroughly reviewed (Tr. 20) the notes of Tieman's primary care doctor, who did not report that Tieman used a cane (Tr. 266-300, 332-36). The ALJ further noted that at least one physician apparently told Tieman to try to get rid of his cane (although Tieman did not think he could). (Tr. 23) There is substantial evidence to support the ALJ's finding that Plaintiff did not have a medical necessity for a cane. Hence, the ALJ's decision not to incorporate the limitation of a cane into Plaintiff's RFC determination was not unreasonable.

Tieman further argues that the ALJ did not fully consider his non-exertional limitations (D.I. 18 at 7) Specifically, Plaintiff asserts he is limited by a requirement to be "off-task" frequently throughout the workday, because of pain. (D.I.18 at 7) The sole source of this proposed limitation is the Physical Residual Functional Capacity Questionnaire completed by Dr. Dickinson. (Tr. 395) The ALJ addressed the contents of this questionnaire, noting particularly the absence of justification or objective evidence in support of the assertions contained in it. (Tr. 23) Plaintiff also asserts that his psychiatric limitations were not fully considered, citing the treating physicians' opinions that his depression and anxiety symptoms had not been reduced despite "the many treatments attempted." (D.I. 18 at 7) The ALJ reviewed the record and observed Tieman's lack of formal psychiatric treatment, with his only therapy being regular prescriptions of Valium provided by his primary care physician. (Tr. 23-24) Thus, again, the

22

Court finds substantial evidence supports the ALJ's assessment of Plaintiff's RFC.

### 2.    The Medical Opinions of the Treating Physicians

Plaintiff argues that the ALJ gave insufficient deference to the opinions of his treating

physicians, Drs. Godfrey, Patel, and Dickinson. (D.I. 18 at 7-10) Dr. Godfrey indicated that the

Plaintiff was "unable to sit or stand for any length of time." (Tr. 190) Dr. Patel stated the

Plaintiff could not "sit or stand for periods of time during the day," nor could he "work at his

previous type of employment secondary to his back pain." (Tr. 401) Dr. Dickinson indicated

that Plaintiff could sit or stand for less than two hours of an eight hour workday, and would miss

work more than four times per month due to pain. (Tr. 393-96) Generally, the Commissioner

gives the most weight to the opinion of a claimant's treating physician, since a treating physician

has the most knowledge about the individual patient's medical history. *See* SSR 96–2p, 1996

WL 374188, at *4. The Commissioner responds to Plaintiff's argument by contending that the

proffered opinions of the treating physicians here are largely unsupported by objective evidence,

and are often in conflict, either internally or with other portions of the record. (D.I. 20 at 13-16)

The Third Circuit subscribes to the "treating physician doctrine." *See Mason v. Shalala*,

994 F.2d 1058, 1067 (3d Cir. 1993). In declining to give the treating physicians' opinions

controlling weight, the ALJ found them "not well supported by medically acceptable clinical,

laboratory or diagnostic techniques . . . and . . . inconsistent with the other substantial evidence in

the record." (Tr. 26) *See Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001). The opinions

of Drs. Godfrey and Dickerson (Tr. 190, 393-96) appeared as responses to standardized

questionnaires, which contained minimal elaboration and little or no citation to objective

evidence. *See Mason*, 994 F.2d at 1065 (stating two-page New Jersey Division of Rehabilitation

23

form, on which treating physician "check[s] boxes" and "fill[s] in blanks," was "weak evidence at best"); *see also Coates v. Astrue*, 2009 WL 1514457 (W.D. Pa. May 29, 2009) (noting ALJ appropriately gave little weight to Pennsylvania Department of Public Welfare forms prepared by treating physician because forms were not accompanied by any explanation). These opinions conflicted with substantial evidence in other parts of the record, such as Godfrey's patient care notes (Tr. 233-56), in which Godfrey indicated he could not point to an objectively measurable problem to explain Tieman's pain complaints, and the MRI study of Tieman's lumbar spine, which conveyed an impression of "[m]ild degenerative disease . . . [without] disc herniation or spinal canal narrowing." (Tr. 302) The opinion of Dr. Patel was received as a one-page memo entitled "Certificate of Professional Care/Medical Necessity," which indicated that Tieman had a diagnosis of chronic back pain, and stated: "His pain medications are managed by his pain management physician. In our evaluations of Mr. Tieman, he can not sit or stand for periods of time throughout the day. He can not work at his previous type of employment secondary to his back pain." (Tr. 401) The opinion offers no objective evidence in support of these conclusions, and is not entitled to controlling weight.

Accordingly, the Court concludes that the ALJ did not err in declining to give controlling weight to the opinions of the treating physicians.

### 3.    The Hypothetical Posed to the VE

Plaintiff argues that the ALJ's hypothetical question posed to the vocational expert should have contained the additional limitations of Tieman's need for a cane and his non-exertional limitations. (D.I. 18 at 10) The Commissioner responds that these issues are identical to those already addressed above in consideration with the ALJ's determination of Plaintiff's RFC. The

24

Court agrees.

An ALJ's question to a vocational expert may only be used to determine a claimant's

disability if "the question accurately portrays the claimant's individual physical and mental

impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984); *see also Ramirez v.*

*Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004) ("If . . . an ALJ poses a hypothetical question to a VE

that fails to reflect 'all of the claimant's impairments that are supported by the record . . . [the

VE's testimony] cannot be considered substantial evidence.") (internal quotation marks omitted).

As discussed above, substantial evidence supports the ALJ's determination of Tieman's RFC –

which did not include the need for a cane and non-exertional limitations – so the hypothetical to

the VE did not need to include other limitations. *See generally Rutherford v. Barnhart*, 399 F.3d

546, 554 (3d Cir. 2005).

### 4.      The Finding of No Severe Mental Impairment

Finally, Plaintiff argues that the ALJ erred in finding that his mental impairments were

not severe. (D.I. 18 at 12)  The Commissioner responds that the ALJ conducted an appropriate

analysis using the special review technique provided for by the regulations,[4] and points to an

absence of objective record evidence of Tieman's asserted impairments. (D.I. 20 at 18)

Objective evidence includes medical signs and laboratory findings. *See* 20 C.F.R.

§§ 404.1529(a), 416.929(a).  A simple recitation of a patient's subjective complaints in a report

---

[4]Functional areas to be considered include: activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation.  20 C.F.R. § 404.920(a) states: "If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild', and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence indicates that there is more than a minimal limitation in your ability to do basic work activities."

or treatment notes does not transform subjective complaints into objective medical findings nor

entitle such complaints to controlling weight. *See Hatton v. Comm'r of Soc. Sec. Admin.*,131

Fed. Appx. 877, 879 (3d Cir.2005).

Here, Dr. Patel's encounter records repetitively noted longstanding anxiety, without

further elaboration; treatment consisted of regular renewals of a prescription of Valium. (Tr.

267-300, 332-36)  As the ALJ noted, Dr. Patel is a primary care physician, and never referred

Tieman for evaluation or treatment by a psychiatric specialist. (Tr. 23-24)  The ALJ further

noted that Dr. Fugate, an Agency psychiatrist who evaluated Plaintiff, found only mild depressive

symptoms, reported no history of psychiatric treatment, and opined that Plaintiff was able to meet

the demands of simple work in a low-contact setting. (Tr. 23, 230)  Finally, the ALJ relied on

Plaintiff's own admission that he had not seen a psychiatrist in over two years. (Tr. 24, 56)

In sum, the ALJ properly applied the special review technique and had substantial

evidence to support his conclusion that Plaintiff's mental impairments were not severe.

## V.   CONCLUSION

For the foregoing reasons, the Court will deny Plaintiff's motion for summary judgment

and grant Defendant's motion for summary judgment.  An appropriate Order has been entered.


April 1, 2014
Wilmington, Delaware                    UNITED STATES DISTRICT JUDGE